Filed 11/25/20  In re D.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.S. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.S., <br><br> Defendant and Appellant. | F080999 <br><br> (Super. Ct. Nos. JD138325-00, JD138326-00) <br><br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Marcos R. Camacho, Judge.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Bryan C. Walters, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Meehan, J. and De Santos, J.

In this juvenile dependency case, K.S. (mother), appeals the juvenile court's order terminating her parental rights as to her two minor sons (Welf. & Inst. Code,[1] § 366.26). She contends the court erred by failing to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2018, the Kern County Department of Human Services (department) filed petitions on behalf of three-year-old K.S. and four-year-old D.S. (collectively, "the children") alleging they came within the juvenile court's jurisdiction under section 300, subdivision (b) (failure to protect) based on domestic violence between mother and mother's boyfriend, Jessie L., which occurred in the presence of the children. It was alleged that mother and Jessie were driving with the children in the car and began to argue. Jessie grabbed the steering wheel, causing the car to swerve. The next day, Jessie punched mother and threw her against a wall. The children did not witness this incident, but it was reported mother and Jessie argued daily or every other day, sometimes in the presence of the children.

When interviewed by the investigating social worker, mother denied domestic violence and stated her face was swollen not because Jessie had punched her but due to her wisdom teeth. She reported that when Jessie gets angry, he does not hit her but punches holes in the walls. Mother stated every argument between she and Jessie gets physical, but she was the physical aggressor in the relationship. She explained she had been in five previous abusive relationships, and she no longer wants to be a victim. Mother told the social worker that Jessie was a good guy and her role model for parenting. Mother was recommended to enroll in domestic violence counseling.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2.

There were child welfare referrals involving mother dating back to 2013. Some involved allegations of domestic violence between her and K.S.'s biological father. Jessie had a previous child welfare referral alleging physical abuse against his minor sibling and nephew. It was alleged Jessie verbally threatened to physically harm his sibling and nephew. Jessie moved out of the residence, and the allegations were determined to be inconclusive.

The children were placed in protective custody and subsequently ordered detained from mother. They were placed with K.S.'s paternal grandparents, Lori and Marty E., who lived out of county in Lompoc. The court ordered mother to have supervised weekly visits of four hours if the visits were to occur in Lompoc, or two-hour visits twice a week if they were to occur in Bakersfield.

Following the detention hearing, mother told the social worker she intended to stay in a relationship with Jessie and that they were engaged to be married. She stated her mother and her attorney advised her to get a restraining order against him, but she did not want to. Mother continued to deny domestic violence and asked if Jessie could visit the children with her. The social worker advised her he could not.

A couple of days later, mother advised the social worker she and Jessie were no longer living together because he had gone on a "drug binge." A week after that, mother informed the social worker, she and Jessie were back together and "inseparable" and that Jessie was no longer using drugs. Mother stated she would attend the domestic violence services she was being recommended and might put her relationship "on pause" while completing the classes but intended to maintain a relationship with Jessie. The social worker informed mother the department did not support or condone her relationship with Jessie given domestic violence in the relationship led to her children's removal. Mother expressed she understood.

At one of mother's visits with the children in March 2018, mother asked to end the visit early because the children kept asking for Lori. The visit was ended early and the

3.

children were looking out the window waiting for Lori to arrive. The visit otherwise went well. When Lori arrived, the children appeared excited and happy to see her and gave her hugs.

Following the visit, mother informed the social worker she had found heroin and a needle in the sink and called Jessie's probation officer. Mother said Jessie was arrested for violating his probation. Mother expressed her intention of maintaining a relationship with Jessie while he completed 10 days of custody and eight months of drug rehabilitation.

At a visit a week later, mother asked the children if they wanted to talk to Jessie. Neither child gave a response. Mother contacted Jessie via FaceTime; D.S. just looked at the phone, but K.S. responded by smiling, laughing, and saying hello. The family played together, but the supervisor of the visit noticed that mother needed to work on boundaries. It was noted mother "allows her children to get what is desired rather than follow her directions." About halfway through the visit, D.S. began to ask for Lori. The supervisor asked D.S. if he was ready to go back with Lori, and he said yes. Lori came to pick them up. Mother began to cry when she said goodbye to the children, which caused the children to begin crying.

Mother waived her right to a jurisdictional hearing and submitted the petition on the reports. On March 15, 2018, the juvenile court found the allegations of the petition true and that children were persons described by section 300, subdivision (b). Mother stated her intent for disposition was return of the children on family maintenance services.

Following the jurisdictional hearing, mother told the social worker she was working on her services and intended to stay in a relationship with Jessie and would not separate anymore.

At a visit the next day, mother and the children ate together. K.S. fell off the picnic table, and mother consoled him. The children played on the swings and mother

4.

then said, "Let's call dad," referring to Jessie. She called twice with no answer. She tried calling again and asked to go back outside so she could try to get service. Mother got a hold of one of Jessie's friends and asked the children if they wanted to talk to "dad." The children gestured no, and mother said, "Come on let's talk to him. He really misses us." She handed the phone to D.S. who smiled but did not say anything. Mother told the children to say hello but they appeared to be shy. The family went back inside and mother and the children laid down on the ground. The children crawled over to mother and K.S. got on top of mother. Mother rubbed his back.

At the next visit, mother and the children played but the children were hungry. Mother asked to end the visit early because the children were hungry and because of the weather. The visit was ended and mother hugged and kissed the children goodbye.

Mother cancelled her visits for a week due to having a contagious rash on her hand, for which she was taking antibiotics. The following week, mother reported to the social worker she had not yet begun domestic violence services. Mother reported that Jessie had left rehab and moved back in with her, and they were working on their relationship.

At the dispositional hearing on April 24, 2018, the parties submitted on the reports. The court adjudged the children dependents of the court and removed them from mother's physical custody. The court ordered mother to participate in 12 months of reunification services, including counseling for domestic violence as a victim, mental health services, and random drug testing. Services were not provided to either biological father as they were not requesting services.

Mother requested to end visits early in May and June 2018. At a visit in July 2018, K.S. appeared hesitant to leave Lori at the beginning of the visit. Mother asked K.S. for a hug and K.S. smiled and complied. The children and mother played on the swings, ate, and talked. At one point, D.S. was misbehaving. Mother ignored him at first and then tried to get him to engage with she and K.S. When she reached her hand out to

him, D.S. scratched her.  Mother told him that was not nice, and D.S. smirked and laughed in mother's face.  Mother continued to try to get D.S. to go to where she and K.S. were playing, but D.S. refused to move and continued to smirk at her.  Mother allowed him to have his way.  Later, D.S. became upset and scratched K.S.  Mother attempted to put D.S. in a timeout, but he would not comply.  Mother requested the visit to end an hour early because "D.S. was in a bad mood and not cooperating."  When Lori arrived to pick up the children, the children had settled down, so Lori offered to return later so mother and the children could finish their visit, but mother ended the visit because she stated she had a class to attend.

Mother continued to report to the social worker several instances of separating from and reconciling with Jessie.  In June 2018, she reported trying to have a child with him.  In August 2018, she reported they had broken up and he had moved out of town.  By September 2018, they were back in a relationship and living together.  That month, law enforcement was dispatched to her home due to a physical altercation between she and Jessie, and she was arrested for spousal battery.

As for mother's participation in services, the social worker indicated in their six-month status review report that mother (1) was enrolled and participating in domestic violence as a victim counseling; (2) was dropped from mental health counseling and had not provided proof of reenrollment; (3) failed to appear to drug test; and (4) was not meeting her case plan objective of visiting with the children on a regular basis because she frequently ended visits early and was not consistent with following through in redirecting her children when they showed negative behaviors.

At the six-month review hearing on October 24, 2018, the court continued mother's reunification services.  Following the hearing, mother reported to the social worker that she felt like she was not bonding with the children at visits and sometimes the children requested to leave early.  When the social worker asked mother what she learned

6.

from her domestic violence class, mother responded that she did not know why she was required to take the class and did not feel like a victim.

In November 2018, mother completed domestic violence counseling and reported to the social worker she and Jessie were not together anymore.

At a November 2018 visit, mother and children played and ate at the park. Mother then asked to end the visit an hour early as the park was too crowded. The supervisor encouraged mother to enjoy the visit, and mother watched the children play for the rest of the visit. At the end of the visit, the children smiled and waved goodbye to mother as they left with Lori and Marty. Later that month, mother visited with the children at Chuck E Cheese. The children and mother greeted each other with hugs. Mother appeared nervous and asked the supervisor whether she should let the children play games or eat first and that she did not have much money. She asked the supervisor to borrow money because she left her money in the car. The supervisor said she would watch the children while mother got the money. Mother did not respond and went to the counter and had cash to pay. Mother appeared overwhelmed because the children wanted to go different directions.

On the way to a visit in December, mother complained to the supervisor about traveling to Lompoc to the visits. Mother explained her attorney told her not to miss any visits and at least to make an attempt to visit.

Mother was informed a visit would be canceled due to the department's winter break. When asked if she wanted to schedule a makeup visit, mother stated she did not need one and was "fine" to video chat. The social worker told mother she was owed the visits and the department would make any accommodations necessary, but mother insisted she does not feel like she was missing out on time with the children.

In December 2018, Jessie was arrested due to a domestic violence incident at mother's residence.

7.

In January 2019, the supervisor picked mother up to transport her to a visit. Jessie was present and asked mother what time she would return. Mother rolled her eyes and complained she was tired of the drive but expected to be home by 6:00 p.m. When they were minutes from the visit location in Lompoc, mother stated the visit should be canceled because the children were sick. The supervisor contacted Lori, and Lori stated the children were fine; they had been sick but they were cleared by their doctor and had been at school all week. Mother insisted the visit should be canceled and that she would rather have a video chat with the children. The visit was canceled due to mother's "lack of interest." The supervisor asked mother why she did not mention the children were sick before they left, and mother said her attorney told her she only had to attempt to visit and she did not actually have to stay for a visit if she did not feel circumstances allowed. The social worker later encouraged mother to attend all her visits and attempt to stay the whole four hours.

Later that month, the supervisor took mother to her visit at Lompoc, and on the ride there, mother told the supervisor that the week before that Lori said the children were too sick to visit but then took them to the movies and other places. The visit went generally well, but while the children were riding scooters, the children fell, and D.S. hit his head, injuring himself.

In February 2019, mother and Jessie went to the department together to ask what classes Jessie would have to take in order to visit with the children. Jessie informed the social worker he was meeting with his probation officer to discuss a domestic violence class and wanted to participate in one that would count for the department's requirements as well.

A few days later, Jessie was present when the social worker met with mother. Mother reported she and Jessie were living together some of the time and they had been getting along. The social worker expressed concern to mother that though she completed

her classes, she had not addressed the issue that brought the children to the attention of the department.

Mother had missed some visits due to bad weather and declined to make them up when given the opportunity.

At a visit in February 2019, it began to sprinkle lightly, and mother told the supervisor that she would need to call the care provider to pick up the children early. The supervisor said to wait to see if the rain would stop, and it did. Mother then complained there were puddles under the swing sets and the supervisor suggested they did some other things, so they kicked a ball around and ate. The children then rode scooters mother brought. Lori arrived while the children were riding the scooters and expressed concern the children were again not wearing helmets. Mother overheard the conversation and said, "these are my children and I can raise them how the f--k I want to…. I will never buy them helmets, you can just bring the ones you have."

In February 2019, Lori reported to the social worker that the children were doing well and they had no behavioral problems. K.S. had been receiving counseling since September 2018. K.S.'s counselor reported that she had worked closely with Lori on parenting and behavioral goals and that K.S. had shown great improvement in verbal skills and decreased anxiety. The counselor reported Lori had implemented house rules, stability, and communication skills and K.S.'s behavior had "changed drastically since being placed in this home it has been due to the structure, love, and stability being provided" in the home. The counselor reported it was in K.S.'s best interest to remain in the home for continued growth and stability.

In February 2019, the social worker requested information from law enforcement about calls to mother's address. Law enforcement reported there had been calls for domestic violence incidents at mother's address on February 2, May 27, June 15, July 11, September 18, October 23, as well as December 19, 2018.

On the way home from a visit in March 2019, mother told the supervisor she was seven weeks' pregnant.

In its 12-month status review report, the department recommended mother's reunification services be terminated.

At the 12-month review hearing on March 15, 2019, mother testified she attended every visit and only ended visits early twice. Mother stated her visits went well though sometimes the children are quiet and do not want to talk but they later warm up. The children ask her when they can come home and tell her they miss her and miss home. Mother testified that she did not take the opportunity to make up canceled visits because the children did not want to stay for four hours "with nothing to do" and she would not force the children to stay. Mother testified that she and Jessie broke up in October. The domestic violence incident in December was because he broke into her home. She admitted she and Jessie went to the department together asking if he could get services. Mother denied being pregnant.

Lori testified the children's behavior was very bad when they first were placed with her but had substantially improved since then. She picked up the children early from visits every time except for once. The visits were scheduled to last for four hours, but most of them only lasted two hours. Mother provided "every excuse" for why the visits should end early. Out of 55 visits, nine were canceled by mother, four by the department, and six by the care provider. Mother was always offered make up time when a visit was canceled, but she never wanted to make them up. Lori said the children love their mother but do not like the fighting that goes on in their home. Lori testified that mother has been in a relationship with Jessie until at least March 1, 2019, based on text messages she has received from mother.

The hearing was continued to April 15. At the continued hearing, counsel for the department made an offer of proof and stated if the social worker were called to testify, she would testify that there was a visit the previous week where the children said they did

10.

not want to go home with mother at that time.  Mother requested her reunification services be extended.  The juvenile court terminated mother's reunification services and set a section 366.26 hearing.  Thereafter, the children were removed from Lori's home due to some family health issues and placed in foster care.

In April 2019, mother told the social worker she had not had contact with Jessie for several months and had filed a restraining order against him.  Proof of this restraining order was provided to the department, with an expiration date of April 16, 2022.

In August 2019, the department filed a section 366.26 report.  The report indicated mother attended 42 of 72 possible visits.  The report indicated D.S. expressed he would like to be returned to mother because he loves her and the fact he cannot be returned to mother made him "very sad."  K.S. expressed he would like to live with Lori because he is very attached to her.  The report indicated the children had been out of mother's custody for 17 months and did not look to her to meet their daily needs.  The report also indicated, however, that the children were attached to their mother, and it may be detrimental to terminate parental rights.  The report indicated the children were considered generally adoptable but adoption was not the permanent plan because there were no prospective adoptive parents or suitable relative placements.  The adoptions social worker recommended a permanent plan goal of placement with a fit and willing relative.

A few days later, the department prepared a supplemental report changing its initial recommendation of permanent plan to adoption.  The report indicated mother had not regularly visited, but the visits that occurred were of good quality and the children enjoyed the time they spent with mother.  The supplemental report indicated "the benefit and permanency of adoption outweighs any detriment to the children caused by severing the mother/child relationship."  The supplemental report stated the children "do have a degree of attachment to their mother; however, the benefits and permanency of adoption outweigh any detriment that may be caused by the termination of parental rights."  The

children were determined to be generally adoptable due to their ages and lack of any significant medical issues or behavioral concerns and, though the current care provider was not willing to adopt, it would not be difficult to locate an adoptive home for the children.

In September 2019, the children were placed with their paternal grandmother's niece and husband, who were willing to adopt the children.

In November 2019, the department prepared another supplemental report that indicated mother gave birth to a child in October 2019.  It also indicated mother had consistently visited twice weekly for two hours since the previous report, and visits were reported to go well.

In January 2020, the social worker learned that Jessie's address was the same one listed for mother.  Jessie's probation officer confirmed Jessie's address with the social worker but said Jessie informed the probation officer he would be moving out so that mother could get her children back.

Another supplemental report prepared in February 2020 indicated mother and the children had several visits from December 2019 through February 2020 that went well. Two visits in December 2019 were canceled, however, because no one showed up.

At the section 366.26 hearing held on March 3, 2020, the adoption social worker testified her initial recommendation that the children were not appropriate for adoption planning was based on her assessment that D.S. was too old for parental rights to be terminated.  She was subsequently instructed to change the recommendation, which is why she prepared the supplemental report.

The social worker testified she had observed visits and found them to be of "very good quality."  Since the children's placement was moved to Kern County, mother's visits had been consistent.  The social worker's belief that mother's visits were regular and consistent in her initial report, despite mother only attending 42 out of 72 visits, was based on the facts that the visits were far away, the care provider had told mother the

visits could only be supervised by the department and mother could have had more visits by having her mother supervise the visits, and because there was a volatile relationship between mother and the care provider. She did not recall that mother ended visits early, and was not aware that mother frequently declined to make up visits with the children. Since the children were moved to Kern County, mother's visits are closer to 100 percent.

The social worker testified she believed the children had a good time at visits but got restless. The social worker opined mother did the best she could to keep the children entertained for the two-hour time slot. Mother had been bringing her baby to the visits, and the children appeared to enjoy spending time with their sister but were not particularly sad to say goodbye. The social worker believed the children were very attached to mother and were at an age where they would remember her; she saw a benefit in continuing the relationship. The social worker testified that not having mother in the children's lives would make them sad. The social worker stated the attachment was evidenced by touching, hugs, kisses, I love you's, smiles, and eye contact between mother and the children. The social worker believed there was a substantial relationship between the children and mother; the children may experience some detriment, but it was not significant enough they will suffer emotional trauma.

The social worker testified the children liked where they lived and were happy to see their care provider. The children wanted to go home after visits with mother. The care providers provided the children with their daily physical and emotional needs. The social worker believed the children were generally adoptable.

The children's court appointed special advocate (CASA) testified that she had supervised two visits between the children and mother in February 2020. During the first visit she observed, there was not much interaction between mother and the children. The children played on their own, and mother held her baby. The CASA observed that at the end of the second visit, the children were waiting and excited, ready to leave the visit. Mother asked for a hug, and the children complied and then the caregivers took them.

The CASA observed the children did not seek out affection from mother but did seek attention from the care providers. They gave the care providers affection at will or at random. The CASA testified she saw mother with Jessie together after a visit on February 19, 2020.

Lori testified that from February until October 2018 the visits were in Bakersfield and were supposed to last for four hours, but very few consisted of four hours. From October 2018 to May 2019, the visits took place in Lompoc, and only one was canceled due to mother not having transportation. The department transported mother to every other visit. When the children lived with Lori, they never asked for mother. Mother would FaceTime with them about twice a week toward the beginning of the case, but later she rarely called. Lori often took the children to the beach, where many of mother's visits in Lompoc took place, and they would stay two to four hours, closer to four hours. When Lori took the children to the beach, they never got bored or wanted to go home; she would have to "make them go home." Mother tried to end every single visit early until Lori refused to pick them up early.

The children's current caregiver testified the children were placed with her in September 2019. She had known D.S. since he was about three months old and K.S. pretty much his whole life. There was one visit where K.S. refused to go. The care provider had K.S. call mother; he told mother did not want to go, and mother said it was okay. The care provider only took D.S. to the visit, but did return at the end of the visit with K.S. to give him an opportunity to say hi to mother, which he did and then turned around and went back to the car. The care provider testified that generally the children did not get excited to go to visits with mother. They would sigh as if they did not want to go but went willingly. Sometimes the care provider had to push them to get out of the car when they arrived at visits, but when she picks them up, the children run to the car and give the care provider a hug and are ready to go. The care provider had not observed the children to have any issues leaving mother at the end of visits, but they had a difficult

14.

time leaving Lori when they visited her. When the children were first placed with her, K.S. would cry for at least an hour after saying goodbye to Lori. The children did not ask about mother when they were home, and mother did not call them. She had discussed with the children whether they want to go back and live with their mother and they had expressed they do not, but had expressed a desire to live with Lori. The children called the care provider and her husband "mom" and "dad" and their kids brothers and sisters. The care provider saw mother with Jessie after a visit the previous week. The care provider intended to adopt both children, and will allow the children to see Lori, mother, and their sister if they ask.

Counsel for the department and the children argued the appropriate permanent plan was adoption. Mother argued the beneficial parent-child relationship exception to termination of parental rights applied and argued the children's permanent plan should be long-term foster care or legal guardianship.

The court found the children to be adoptable.

As for whether the beneficial parent-child relationship exception to termination of parental rights applied, the juvenile court found that mother had not met her burden of proving she had regularly and consistently visited the children. The court noted the evidence was "pretty clear" mother was inconsistent with visits and only started consistently visiting once her reunification services were terminated. The court opined mother "realized that she better get on the band wagon and better start … having visits with her children so that she could argue … she's been having consistent visits." The court stated it did not think mother's intent was to develop a parental relationship with the children.

As to whether mother and the children had a beneficial parent-child relationship, the court noted the children do have "some type of bond with" mother but that it was not the type of bond that went beyond just loving and affectionate. The court did not see mother stepping into a parental role in the children's lives and her visits never progressed

15.

beyond supervised visitation. The court also noted that though mother completed domestic violence classes, she "still does not understand the negative effect domestic violence has on her children." The court noted there was a pattern of domestic violence that continued during the dependency proceeding. The fact that mother still engaged in her relationship with Jessie indicated her relationship with the children was not a beneficial parent-child relationship. The court concluded there would be detriment in continuing the relationship with mother as long as she does not understand the dangers domestic violence poses to the children. The court terminated all parents' parental rights.

Mother appealed.

## DISCUSSION

Under section 366.26, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).) "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption. (§ 366.26, subd. (c)(1).) There are statutory exceptions which " 'permit the court, in *exceptional circumstances* [citation], to choose an option other than … adoption.' " (*In re C.B.* (2010) 190 Cal.App.4th 102, 122.) " '[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an *extraordinary case* that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621, italics added.)

16.

The beneficial parent-child relationship exception is one of the statutory exceptions. Section 366.26, subdivision (c)(1)(B)(i) provides the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show termination of parental rights would be detrimental to the child because an exception applies. (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.)

With regard to the factual findings the juvenile court must make (whether the parent has maintained regular visitation and/or whether a beneficial parental relationship exists), if the court does not find the parent met his or her burden of proving these findings, the question on review is "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 647.) The specific question is "whether the … evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We review a court's determination that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption for abuse of discretion. (*In re Breanna S.*, at p. 647.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)[2]

---

[2]     Appellate courts have adopted differing standards of review for the beneficial parent-child relationship exception: substantial evidence (see, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165); abuse of discretion (see, e.g., *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449; and, more recently, as we have applied here, a "hybrid" standard (*In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 647). The issue of the proper

We do not find mother's evidence compelled as a matter of law a finding she regularly and consistently visited the children. Though mother elicited an opinion from the social worker that mother regularly visited, there was evidence on the record mother missed dozens of visits, requested to end a great number of visits early, and declined the opportunity to make up missed visits. Further, when the social worker testified that visits appeared to be regular and consistent, she was not aware mother requested to end visits early and declined to make up visits. " 'Sporadic visitation is insufficient to satisfy' " a finding that the parent regularly and consistently visited. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396.) Though mother's consistency improved after reunification services were terminated and the section 366.26 hearing was set, the court's conclusion that mother's increased visitation was merely an attempt to bolster her argument that her parental rights not be terminated and did not negate her previous inconsistency was reasonable.

Our conclusion that the court was not compelled to make a finding mother regularly and consistently visited is sufficient to affirm the juvenile court's order. A court may base its decision a parent has not met their burden to show the beneficial parent-child relationship exception applies on any or all elements of the exception. (*In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 647.) We further conclude, however, the juvenile court did not abuse its discretion by finding any benefit derived from continuing the

---

standard to apply is currently pending before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.

We note there is not much practical difference between the different standards of review. Under any of these standards of review, the practical differences between them are slight because they all give broad deference to the juvenile court's judgment. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We should interfere only if under all the evidence viewed most favorably in support of the juvenile court's action, it finds no judge could reasonably have made the order. (*Ibid.*) We note we find no error under any standard of review.

relationship did not outweigh the stability and permanence the children would gain from being adopted and did not constitute a compelling reason not to terminate parental rights.

" '[B]enefit from continuing the [parent/child] relationship,' " within the meaning of section 366.26, subdivision (c)(1)(B)(i) has been interpreted to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) " ' "[F]requent and loving contact" is not sufficient' " (*Marcelo B.* (2012) 209 Cal.App.4th 635, 643) as "[i]nteraction between natural parent and child will always confer some incidental benefit to the child" (*In re Autumn H.*, *supra*, at p. 575). In evaluating the issue of whether the relationship outweighs the well-being the child would gain from being adopted, the court must balance "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/ child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

Though there were positive aspects to the children's and mother's visits, there were many aspects that tended to show mother did not occupy a parental role in the children's lives. Mother struggled with following through on redirecting or disciplining the children. She appeared overwhelmed at times and struggled to fill the four-hour visits. At several visits in the beginning of the dependency proceedings, mother seemed preoccupied with involving Jessie in the visits rather than focusing on spending time with the children. Her resistance to allowing the children to ride scooters without helmets despite D.S. getting hurt raises reasonable concern. The social worker testified the children's care providers, rather than mother, were the people who provided for their emotional needs.

Further, we do not find mother provided sufficient evidence that the children would suffer great harm if their relationship with mother were severed. The children did not have a hard time leaving visits. Pursuant to mother, they often requested the visits to end early. There was testimony the children did not ask for mother when she was not there and did not seem excited to attend visits. Mother, herself, admitted she struggled in bonding with the children. Further, mother's visits never progressed beyond supervised visits. Though the social worker testified the children would suffer some detriment if their relationship with mother were to be severed, she also opined it did not outweigh the benefit they would receive from being adopted.

Mother contends her case is like *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*). We find *E.T.* distinguishable. In *E.T.*, twin minors were removed from the mother due to her history of mental health issues and drug addiction. The minors were returned after a year of reunification services and, after the mother self-reported having relapsed into drug use, she voluntarily placed the minors with the godparents who had earlier served as foster parents. (*Id.* at pp. 70–71.) The juvenile court bypassed reunification services to mother because she was previously provided services and was unsuccessful with reunification. (*Id.* at p. 71.) At the section 366.26 hearing, the juvenile court concluded the beneficial parental relationship exception did not apply and terminated the mother's parental rights, finding the minors had been living with their godparents for 24 months of their lives and only 22 months with the mother, some visits between the mother and the minors had been "difficult," and the minors' bond with the mother was not so strong that they could not be happy with their godparents. (*E.T.*, *supra*, at p. 75.)

The appellate court reversed, concluding the mother's regular contact and visits with the minors, "coupled with [her] efforts during the dependency," demonstrated that the minors would benefit from continuing their relationship with the mother. (*E.T.*, *supra*, 31 Cal.App.5th at p. 76.) The court noted that, "despite denial of services, [the] [m]other continued to participate in programs designed to maintain her sobriety and make

20.

her a better parent. She has consistently tested negative for drugs, and during the dependency remained in drug treatment, took classes in life skills, parenting, cognitive behavior, criminal thinking, anger management and children of alcoholics and addicts." (*Id.* at p. 77.) The court further noted the minors would sometimes act out following visits but the mother provided them with comfort and affection and was able to ease their fear and anxiety, concluding the minors were " 'very tied to their mother' " and "terminating their familial relationship would cause them great harm." (*Id.* at pp. 76-77.)

Here, unlike in *E.T.*, mother did not regularly or consistently visit the children, as discussed, nor did she make significant progress in ameliorating the problems that brought the family to the department's attention. Mother's pattern of engaging in domestic violence relationships had been ongoing. The children were removed due to domestic violence between mother and Jessie. Though mother completed domestic violence services, her participation in these services were not meaningful. She continued the relationship with Jessie, which was extremely unstable throughout the proceedings, characterized by frequent breaking up and reconciling and domestic violence incidents. They had a child together, which mother attempted to hide in her testimony at the 12-month status review hearing. The evidence of mother's failure to ameliorate the issues which brought the family to the department's attention supported the juvenile court's finding that not only had mother not shown benefit in continuing the relationship sufficient to outweigh the benefits of adoption, but that there would be detriment to the children if the relationship were to continue.

We find no error.

## DISPOSITION

The juvenile court's order is affirmed.